ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

SHANNON BOYLAN (D.C. Bar No. 1724269)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
150 M St NE
Washington, D.C. 20002
Tel: (202) 598-9584; Fax: (202) 305-0506
E-mail: shannon.boylan@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| **CASCADIA WILDLANDS, OREGON WILD, UMPQUA WATERSHEDS** | Case No. 6:26-cv-126 |
| Plaintiffs, | Honorable Judge Kasubhai |
| v. | **FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **U.S. BUREAU OF LAND MANAGEMENT**, | |
| Defendant, | |
| and | |
| **AMERICAN FOREST RECORD COUNCIL, ASSOCIATION OF O&C COUNTIES,** | |
| Intervenor Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL BACKGROUND ............................................................................................. 3

    I.      Federal Land Policy Management Act ......................................................... 3

    II.     National Environmental Policy Act ............................................................ 3

    III.   Oregon & California Revested Lands Act .................................................. 4

FACTUAL BACKGROUND ........................................................................................ 5

    I.      The Southwestern Oregon Resource Management Plan ............................. 5

    II.     The 42 Divide Project ................................................................................. 6

STANDARD OF REVIEW ........................................................................................... 7

    I.      Preliminary Injunctions are Extraordinary Remedies ................................ 7

    II.     Review of Agency Decisions Under the Administrative Procedure Act ................ 8

ARGUMENT ................................................................................................................. 9

    I.      Plaintiffs Are Not Likely to Succeed on the Merits .................................... 9

         A.    The 42 Divide Project Complies with FLPMA. ....................................... 9

            (1)    BLM complied with the RMP direction to protect older, structurally complex forest. ........................................................... 10

            (2)    BLM complied with the RMP's 20-Year Standard. ..................... 14

         B.    The 42 Divide Project Complies with NEPA. ........................................ 20

            (1)    BLM applied the relevant regulations and rationally determined that an EIS is not required. ........................................ 20

            (2)    BLM adequately analyzed the effects of wildfire severity. .......... 25

    II.     Plaintiffs Have Failed to Demonstrate that they Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction. ............................... 27

    III.   Plaintiffs Have Failed to Demonstrate that the Balance of the Harms and the Public Interest Weigh in Favor of Injunctive Relief. ............................ 30

IV.     Plaintiffs Should be Required to Post a Bond........................................................ 35

CONCLUSION................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................................................ 8

*Am. Whitewater v. U.S. Forest Serv.*,
2025 WL 2945591 (9th Cir. Oct. 8, 2025)........................................................................ 21, 22

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)............................................................................................................. 27

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council Inc.*,
462 U.S. 87 (1983)............................................................................................................. 2, 8

*Bark v. U.S. Forest Service*,
958 F.3d 865 (9th Cir. 2020) ............................................................................................... 23

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ............................................................................................... 29

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) ........................................................................... 20, 24, 25, 26

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ........................................................................................ 27, 30

*Dept. of Transp. v. Public Citizen*,
541 U.S. 752 (2004)............................................................................................................... 4

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ............................................................................................... 23

*Earth Island Institute v. Carlton*,
626 F.3d 461 (9th Cir. 2010) ............................................................................................... 27

*Friends of Animals v. Bergum*,
164 F.4th 738 (9th Cir. 2026) ........................................................................................ 20, 21

*Friends of Big Bear Valley v. U.S. Forest Serv.*,
776 F. Supp. 3d 824 (C.D. Cal. 2025) ................................................................................. 23

*Friends of Bitterroot v. Marten*,
No. CV 20-19-M-DLC, 2020 WL 2062139 (D. Mont. Apr. 29, 2020)................................... 28

*Friends of Endangered Species, Inc. v. Jantzen*,
760 F.2d 976 (9th Cir. 1985) ............................................................................................... 23

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) ............................................................................................... 27

*Friends of the Wild Swan v. Weber*,
955 F. Supp. 2d 1191 (D. Mont. 2013).................................................................................. 27

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ................................................................. 9, 10, 12, 15, 16

*Greenpeace Action v. Franklin*,
14 F.3d 1324 (9th Cir. 1992) .................................................................................... 23

*Idaho Wool Growers Ass'n v. Vilsack*,
816 F.3d 1095 (9th Cir. 2016) .................................................................................. 19

*Klamath Forest All. v. U.S. Forest Serv.*,
746 F. Supp. 3d 761 (N.D. Cal. 2024)....................................................................... 21

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
638 F. App'x 648 (9th Cir. 2016) ................................................................................ 3

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230 (D. Or. 2013) ............................................................................ 3

*Klamath-Siskiyou Wildlands Ctr. v. U.S. BLM*,
No. 1:23-cv-00519-CL, 2024 WL 2941529 (D. Or. May 24, 2024) ........................... 17, 18, 22

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ................................................................................ 7, 8

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989)............................................................................................... 23

*Mazurek v. Armstrong*,
520 U.S. 968 (1997).................................................................................................. 8

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)................................................................................................. 7

*Motor Vehicle Mfrs. Ass'n. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................................... 9

*Munaf v. Geren*,
553 U.S. 674 (2008).................................................................................................. 7

*N. Cheyenne Tribe v. Norton*,
503 F.3d 836 (9th Cir. 2007) ................................................................................... 30

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ..................................................................................... 8

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................... 30, 31

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004).................................................................................................... 3

*Or. Nat. Res. Council Fund v. Brong*,
  492 F.3d 1120 (9th Cir. 2007) ........................................................................... 3

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ....................................................................... 8, 9

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ..................................................................... 30, 35

*Save the Park and Build the School v. Nat'l Park Serv.*,
  No. 3:20-cv-1080-LAB-AHG, 2020 WL 4260801 (S.D. Cal., July 24, 2020) ....................... 35

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
  605 U.S. 168 (2025)............................................................ 2, 3, 4, 20, 23, 25, 26, 30

*Wildlife Fed. v. Haaland*,
  127 F.4th 1 (9th Cir. 2025) ............................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................... 7, 8, 27

**Statutes**

42 U.S.C. § 4332(2)(C)..................................................................................... 3

42 U.S.C. § 4336(b)(2) ..................................................................................... 4

43 U.S.C. § 2601........................................................................................ passim

43 U.S.C. §§ 1701–1785.................................................................................. 3, 4

5 U.S.C. § 706(2) .......................................................................................... 8

**Regulations**

40 C.F.R. § 1501.3(b) (2020)............................................................................ 20

40 C.F.R. § 1501.3(b)(1) (2020) ..................................................................... 20, 21

40 C.F.R. § 1501.3(b)(1), (2) (2020) ................................................................ 20, 21

40 C.F.R. § 1501.3(b)(2) (2020) ...................................................................... 21

40 C.F.R. § 1506.13 (2020) ......................................................................... 21, 22

40 C.F.R. § 1508.27 (1978) ............................................................................ 20

43 C.F.R. § 1610.5–3(a)................................................................................... 3

43 C.F.R. § 46.10 ......................................................................................... 4

43 Fed. Reg. 55,978 (Nov. 29, 1978)................................................................... 4

51 Fed. Reg. 15618 (Apr. 25, 1986) .................................................................... 4

85 Fed. Reg. 43,304 (July 16, 2020).................................................................... 4

85 Fed. Reg. 43,304 (July 16, 2020)..................................................................................... 22

87 Fed. Reg. 23,453 (Apr. 20, 2022) ...................................................................................... 4

89 Fed. Reg. 35,442 (May 1, 2024) ........................................................................................ 4

90 Fed. Reg. 10,610 (Feb. 25, 2025) ...................................................................................... 4

91 Fed. Reg. 618, 622 (Jan. 8, 2026) .................................................................................... 21

**GLOSSARY OF TERMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | Fish and Wildlife Service (US) |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| NR or NRF | Nesting, roosting, and foraging habitat |
| PRMP/FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| RMP or 2016 RMP | 2016 Southwestern Oregon Record of Decision and Resource Management Plan |

**INTRODUCTION**

Plaintiffs seek the extraordinary remedy of a preliminary injunction to halt implementation of the Bureau of Land Management's ("BLM") 42 Divide Forest Management Project ("42 Divide Project" or "Project")—a carefully designed forest restoration and timber management project that directly implements the 2016 Southwestern Oregon Resource Management Plan ("RMP"). But Plaintiffs' motion rests on a fundamental misunderstanding of both the governing RMP and the Project itself. Plaintiffs portray the Project as an unlawful commercial logging initiative that threatens mature forest habitat and increases wildfire risk. The administrative record demonstrates the opposite.

The 42 Divide Project was developed to address precisely the kinds of forest conditions that Plaintiffs acknowledge require active management: overly dense stands vulnerable to severe wildfire, drought stress, insects, and disease. The Project's treatments are specifically designed to restore more resilient forest conditions, reduce stand density, protect large trees, improve long-term northern spotted owl ("NSO") habitat development, and reduce the risk of stand-replacing fire. AR_225–233. Those objectives are not incidental to the RMP—they are expressly required by it. The RMP directs BLM to actively manage Late-Successional Reserve ("LSR") stands that are not currently functioning as NSO nesting-roosting habitat to accelerate habitat development, reduce stand susceptibility to disturbance, and improve resilience to wildfire and climate stressors. AR_57028–30. The Project implements those directives through stand-specific silvicultural treatments developed after extensive field review, modeling, and environmental analysis.

Plaintiffs ask this Court to enjoin the Project based largely on their misapprehension about what the Project does and their disagreement with BLM's scientific judgment about how best to manage these forests. But the Administrative Procedure Act ("APA") does not permit

FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION     1
*Cascadia Wildlands, et al., v. BLM*, Case No. 6:26-cv-00126

courts to substitute Plaintiffs' preferred ecological theories for the considered judgment of the agency, particularly where, as here, the agency relied on extensive scientific analysis, site-specific stand exams, computer modeling, and expert review. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council Inc.*, 462 U.S. 87, 103 (1983). Nor are courts to "micromanage" agency environmental analysis or second-guess predictive scientific determinations that fall "within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025). Because BLM complied with applicable laws in designing and analyzing the Project, Plaintiffs fail to demonstrate a likelihood of success on their Federal Land Policy Management Act ("FLPMA") or National Environmental Policy Act ("NEPA") claims.

Plaintiffs likewise fail to establish irreparable harm. The challenged treatments are specifically intended to improve long-term forest health and reduce the risks posed by severe wildfire and declining stand vigor. Plaintiffs' contrary assertions rely largely on speculation and disagreement with BLM's management approach, not evidence of imminent irreparable injury.

Finally, the balance of equities and public interest overwhelmingly favor denial of an injunction. The Project directly advances congressionally mandated sustained-yield timber management under the O&C Act while simultaneously implementing the fuels reduction, forest restoration, and NSO habitat development objectives under the RMP. The Project supports local communities, county revenues, timber purchasers, contractors, and workers throughout Douglas County. Halting implementation would disrupt binding timber sale contracts, delay restoration treatments, impair BLM's ability to meet RMP treatment objectives, and postpone work specifically intended to reduce wildfire risk and improve forest resilience.

At bottom, Plaintiffs ask this Court to halt a years-long forest management project because they disagree with BLM's scientific conclusions and management choices. But neither

FLPMA nor NEPA authorizes courts to override reasonable agency judgments simply because Plaintiffs prefer a different approach to forest management. Because Plaintiffs cannot establish a likelihood of success, irreparable harm, or that the equities favor injunctive relief, the Court should deny the motion.

## LEGAL BACKGROUND

### I.    Federal Land Policy Management Act

FLPMA establishes requirements for land use planning on public lands. *See* 43 U.S.C. §§ 1701–1785. Under FLPMA, BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield." *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotation marks omitted). Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a). FLPMA "leaves BLM a great deal of discretion in deciding how to achieve" compliance with the applicable land use plan. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), aff'd 638 F. App'x 648 (9th Cir. 2016).

### II.    National Environmental Policy Act

NEPA serves the purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions, so that such potential effects may be considered in the decision-making process. *See Seven Cnty.*, 605 U.S. at 173. NEPA is procedural, not substantive, in nature. *Id.* at 173, 177. To meet the purpose of the statute, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an environmental assessment ("EA") to determine

whether the impacts of an action will be significant, and if not, the agency may prepare a finding of no significant impact ("FONSI") and forego preparation of an EIS.  42 U.S.C. § 4336(b)(2).[1]

In reviewing an agency's compliance with NEPA, "a court should afford substantial deference to the agency." *Seven Cnty.*, 605 U.S. at 180. In conducting a NEPA analysis, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Id.* at 183. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.*; *see also Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) (NEPA is governed by a "rule of reason").

### III.    Oregon & California Revested Lands Act

The Oregon & California Revested Lands Act ("O&C Act") governs 2.4 million acres of western Oregon BLM lands, including the lands at issue here. 43 U.S.C. § 2601. O&C lands must be managed "for permanent forest production, . . . with the principal of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." *Id*. The O&C Act takes precedence over FLPMA in the event of a conflict or inconsistency, "insofar as they relate to the management of timber resources." *Id.* § 1701, Savings Provision.

---

[1] The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986).  CEQ substantially revised the regulations in 2020, *see* 85 Fed. Reg. 43,304 (July 16, 2020), and again in 2022 and 2024.  *See* 87 Fed. Reg. 23,453 (Apr. 20, 2022); 89 Fed. Reg. 35,442 (May 1, 2024).  In 2025, CEQ rescinded all of its regulations. 90 Fed. Reg. 10,610 (Feb. 25, 2025).  The Department of the Interior has its own regulations implementing NEPA at 43 C.F.R. § 46.10 *et seq.*

## FACTUAL BACKGROUND

**I.    The Southwestern Oregon Resource Management Plan**

Following a decades-long public process conducted under NEPA and FLPMA, and after consultation with both the U.S. Fish and Wildlife Service ("FWS) and the National Marine Fisheries Service under the Endangered Species Act ("ESA"), BLM issued the 2016 Southwestern Oregon Resource Management Plan ("2016 RMP"). AR_56949. The planning area for the 2016 RMP includes approximately 1.2 million acres of BLM-administered lands in western Oregon, including the South River Field Office of the Roseburg District. AR_056960. Under the 2016 RMP, BLM distributed the land in the planning area into six different land use allocations, including Late-Successional Reserves ("LSR") and the Harvest Land Base ("HLB"). AR_57006. The RMP contains management direction for each land use allocation, which identifies where future actions may or may not be allowed and what restrictions or requirements may be placed on those actions to achieve BLM's management objectives. AR_057005.

LSR are federal lands primarily, but not solely, dedicated to developing, maintaining, and promoting the development of habitat for the northern spotted owl ("NSO"). AR_057028. The management direction for LSR varies based on whether a particular stand is NSO nesting-roosting ("NR" or "NRF") habitat. *Id.* In LSR stands that are currently NR habitat, the RMP management direction requires BLM to maintain that habitat function. AR_057028. The RMP directs BLM to "protect" a subset of LSR stands that are currently NR habitat and that BLM has determined are "older, structurally complex conifer forests." AR_057029. In LSR stands that are not currently functioning as NR habitat, the RMP directs BLM to apply silvicultural treatments to develop NR habitat. AR_057030.

HLB are federal lands primarily dedicated to "achiev[ing] continual timber production that can be sustained through a balance of growth and harvest." AR_057020. Harvesting timber

in the HLB allows BLM to comply with the O&C Act by selling the annual allowable sale quantity ("ASQ") of timber. AR_056963. The ASQ for the Roseburg sustained-yield unit is 32 million board feet (MMbf). *Id.*

## II.     The 42 Divide Project

On December 18, 2025, the South River Field Office, Roseburg District BLM, issued the EA for the 42 Divide Forest Management Plan ("42 Divide Project"). AR_213-581.[2] 42 Divide is located in Douglas County, Oregon, north and south of Highway 42 near Camas Valley. AR_224. The Project area contains 8,804 acres of BLM-administered land, the majority of which are O&C lands, and are mostly comprised of sub-allocations of LSR, HLB, and Riparian Reserve. AR_000224-225. The purpose of 42 Divide is multi-fold; it "provides an opportunity to provide a sustained yield of timber, restore fire-adapted systems, and contribute to the conservation and recovery of threatened species." AR_225. In the LSR, BLM determined it needed to treat 69 out of the 123 LSR stands, classified as Young High Density without Structural Legacies, by reducing stand density to reduce fire severity, promote resilience, and develop NSO habitat. AR_228-229; AR_20. Additionally, BLM identified a need to treat the other 54 LSR stands, classified as Mature Multi-Layer Canopy, Mature Single-Layered Canopy, and Structurally Complex-Developed, to reduce stand density to develop stand heterogeneity, promote resistance and resiliency to stand-replacing fires, and reduce stand susceptibility to disease and insect infestations. AR_230. In the HLB, BLM determined it needed to offer for sale timber to contribute to the 32 MMBF ASQ for the Roseburg sustained yield unit. AR_233.

The 42 Divide EA analyzed eight issues in detail across the no action alternative, four action alternatives, and a sub-alternative. AR_235-237. BLM authorized the implementation of

---

[2] Throughout their brief, Plaintiffs cite to an earlier version of the EA (AR_3996-4363). While there is not much difference between the two versions, the final EA is at AR_213-581.

FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION          6
*Cascadia Wildlands, et al., v. BLM*, Case No. 6:26-cv-00126

Alternative 3 and the Sub-Alternative ("Selected Alternative") on December 18, 2025, after determining that the Selected Alternative would not significantly affect the quality of the human environment or cause significant environmental effects beyond those analyzed in the Proposed Resource Management Plan/Final Environmental Impact Statement ("PRMP/FEIS") for the 2016 RMP. *See* AR_583-603; AR_20-212. The Selected Alternative included up to 6,039 acres of commercial treatments and 850 acres of understory and pre-commercial thinning. AR_583. Specifically, the Decision Record authorized 922 acres of selection harvest, 4,397 acres of commercial thinning, 720 acres of variable-retention regeneration harvest, 839 acres of understory treatment, and 11 acres of pre-commercial thinning. AR_583.

To date, BLM has auctioned six timber sales to high bidders pursuant to the 42 Divide Decision Record. *See* Declaration of James Halperin ("Halperin Decl.") at ¶ 10. Two of the six timber sale contracts – Petty Larceny and Boulder Shield – are fully executed. *Id.* Timber sale operations can only begin after a contract is fully executed and, if applicable, seasonal restrictions are lifted or waived by BLM. *See generally* Dkt. No. 21-6 (42 Divide timber sale prospectuses).

## STANDARD OF REVIEW

### I.    Preliminary Injunctions are Extraordinary Remedies

"A preliminary injunction is an 'extraordinary and drastic remedy'" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). This exacting standard applies with full force to environmental cases. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc). To obtain a preliminary injunction, a plaintiff must establish that: (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an

injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22-23 (2008).  Alternatively, the Ninth Circuit has found "'serious questions going to the merits' [rather than a likelihood of success on the merits] and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).[3] Under either test, the plaintiff must "establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction," *id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief.  *Winter*, 555 U.S. at 24.  Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), the party seeking such an injunction must make "a clear showing that the plaintiff is entitled to such relief," *Winter*, at 22.

## II.    Review of Agency Decisions Under the Administrative Procedure Act

The Court's assessment of the merits of Plaintiffs' claims is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), based on the administrative record compiled by the agency.  *See Mont. Wildlife Fed. v. Haaland*, 127 F.4th 1, 36 (9th Cir. 2025). Under the APA's narrow and deferential standard of review, a plaintiff must satisfy a "high threshold" to establish that agency action or inaction is unlawful.  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010); *McNair*, 537 F.3d at 988.  Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).  An agency action will be upheld if the agency has considered the relevant factors

---

[3] Federal Defendants respectfully disagree that this formulation accords with Supreme Court precedent including *Winter*, and thus preserve this issue for appeal, while recognizing that this Court is bound by Ninth Circuit law.

and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co.,* 462 U.S. at 105. The scope of review is narrow, and the Court's role is "not to make its own judgment" on matters considered by the agency, as the standard of review "does not allow the court to overturn an agency decision because it disagrees with the decision." *River Runners*, 593 F.3d at 1070; *Motor Vehicle Mfrs. Ass'n. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 29-30 (1983).

## ARGUMENT

**I.    Plaintiffs Are Not Likely to Succeed on the Merits.**

The threshold inquiry for injunctive relief is whether plaintiffs have demonstrated a likelihood of success on the merits warranting an injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (courts need not consider the remaining three elements where a plaintiff fails to show a likelihood of success on the merits). Plaintiffs present arguments under FLPMA and NEPA to support their claim that they are likely to succeed on the merits, or, raise serious questions going to the merits. None withstand scrutiny.

### A.  The 42 Divide Project Complies with FLPMA.

Plaintiffs' FLPMA claims focus on the 42 Divide Project's treatments in LSR, which are designed, in part, to fulfill the RMP's direction to "apply selection harvest or commercial thinning to at least 4,500 acres of LSR-Dry each decade." AR_228. To date, BLM has applied selection harvest or commercial thinning treatments to only 499 acres of LSR-Dry, and has less than two years left to implement treatments on the remaining 4,001 acres. *Id*. As BLM explained in the EA, these treatments are needed to reduce stand susceptibility to disturbances such as fire, windstorm, disease, or insect infestation, and speed the development of NSO habitat. *Id*. Notably, Plaintiffs' state in their brief that they support treatments "designed to restore natural ecosystem processes to forests that have departed from historic conditions, including thinning in

young, dense plantations," Pls.' Br. 1-2. That is exactly what these LSR treatments are designed to do, and they fully comply with the RMP's management directions to protect older, structurally complex stands and speed the development of NSO habitat.

**(1) BLM complied with the RMP direction to protect older, structurally complex forest.**

Plaintiffs' argument that BLM failed to protect older, structurally complex forest rests on an incomplete and misleading reading of the 2016 RMP and the administrative record. Contrary to Plaintiffs' assertions, nothing in the RMP "sets out a clear prohibition on harvest activities in older, structurally complex LSRs." Pls.' Br. 14. Rather, the RMP directs BLM to "[p]rotect stands of older, structurally-complex conifer forest" within the LSR, where "protect" means "to prohibit harvesting activities in a conifer forest stand except as provided by this definition." AR_57029. The RMP then expressly identifies exceptions for "[a]ctivities needed to protect the overall health of the stand or adjacent stands, such as fuels reduction and insect and disease control, and wildfire management actions/activities," even where such activities may "downgrade or remove northern spotted owl habitat or remove marbled murrelet habitat." *Id*.

In the 42 Divide EA and DR, BLM analyzed and authorized, respectively, treatments in LSR stands precisely for the purposes directed by the RMP—namely, protecting forest health by improving resistance and resilience to wildfire, drought, insects, and disease in increasingly stressed forests. *See* AR_228–233. The Project's express purposes in the LSR and LSR-Dry allocations are to: (1) conduct harvest to reduce the stand relative density to the levels directed by the RMP; (2) speed the development of NSO habitat development; and (3) "[r]educe stand susceptibility to disturbances such as a fire, windstorm, disease, or insect infestation." AR_228.

As BLM explained in the EA, "[i]n recent decades, fire suppression and land management . . . [have] led to young trees growing too dense, which makes older trees compete

for resources and weakens them against drought and pests." AR_230. The EA further explains

that "[h]igher tree density has weakened fire resistance, increasing the chances of severe fires."

AR_232. Drought coupled with high stand density negatively affects tree vigor and survival,

while reducing stand density decreases inter-tree competition for water and light and improves

stand resistance and resilience to drought, insects, and disease. AR_254-56.

BLM undertook extensive stand-level analysis to identify specific LSR stands requiring

treatment. BLM identified stands in the LSR "where previous management resulted in stand

structure and composition that would not be resilient to climate-driven stresses, wildfire,

diseases, or insects, and the interactions between these factors." AR_225. BLM then undertook

extensive data collection to evaluate and ground-truth the stands' age, structure, composition,

and habitat. AR_225-26. The agency ultimately identified 123 LSR and LSR-Dry stands with

treatment needs, including 54 mature and structurally complex stands[4] classified as Mature

Multi-Layered Canopy ("M-Multi"), Mature Single-Layered Canopy ("M-Single"), or

Structurally Complex–Developed ("SC-Dev"). AR_228, AR_230. These stands exhibited

relative densities substantially above target conditions,[5] including: (1) 17 M-Multi stands with

---

[4] Plaintiffs' conclusion that there are 38 treatment units in "mature or structurally complex" forest appears to come from BLM's response to one of Plaintiffs' comments on the EA, explaining that "of those 123 stands [in LSR], 38 are in or older than the 80 10-year age class." AR_59. But "older, structurally complex" forest stands as contemplated in the RMP are not defined solely by age, but by a multitude of factors that comprise the highest quality NSO habitat. *See* AR_55186 (PRMP/FEIS definition). For the purposes of the 42 Divide project, any older, structurally complex forest stands that fit the RMP's definition would fall within the 32 stands comprising the M-Multi and SC-Dev stand classifications. *See* AR_230. *See also* AR_056119-122 (PRMP/FEIS structural stage classifications).

[5] The EA details the science behind the target range of 30-45% relative density: "Reducing relative density from 70 to 25 can boost tree diameter growth by 2.5 times. . . . Thus, providing for large diameter limbs and future habitat features like snags and downed wood." AR_229. *See also* AR_254 (Figure 3-1); AR_253-54 ("The onset of inter-tree competition occurs at about 25 percent [relative density] of maximum, 35 percent is the lower limit of full site occupancy, and

relative densities ranging from 55 to 97 (average 66); (2) 22 M-Single stands with relative densities ranging from 32 to 96 (average 62); and (3) 15 SC-Dev stands with relative densities ranging from 68 to 110 (average 70). AR_230. The EA explains that these treatments are needed "to reduce stand density to the target range of 30 to 45," "promote resistance and resiliency to stand-replacing fires," and "reduce stand susceptibility to disease and insect infestations by increasing stand diversity and physical resistance by breaking-up the contiguous canopy cover and reducing overall stand densities." *Id*.[6]

The record also demonstrates that BLM gave heightened consideration to older habitat stands. The EA explains that BLM determined that older LSR stands "over 120 years of age" constituted higher quality habitat and therefore "would be deferred from treatment unless the stand would benefit from treatments to improve resistance and resiliency of the stand to disturbances such as drought, fire, insects, or disease." AR_226. Through this review, BLM identified only eight LSR stands in the 130- to 190-year age classes requiring treatment "to improve stand resiliency for protecting habitat." *Id*. Thus, contrary to Plaintiffs' suggestion, BLM did not indiscriminately authorize treatment in all older forest stands, but instead conducted stand-specific analysis focused on resiliency and habitat protection objectives.

Despite the extensive explanation and analysis in the EA and supporting record, Plaintiffs contend that "[a]t no place in the EA or DR does BLM explain why commercial logging in these specific units is needed to 'protect' existing structurally complex, high quality spotted owl

---

55-60 percent is associated with the lower limit of self-thinning the zone where mortality from inter-tree competition begins.")

[6] The Fish and Wildlife Service likewise concluded in its Biological Opinion that treatments in older stands would "promote resistance and resiliency to stand-replacing fires and reduce stand susceptibility to disease and insect by increasing discontinuity in the canopy and reducing stand densities." AR_712.

habitat." Pls.' Br. 13–14. Plaintiffs specifically identify Unit 30-8-17A as an example for which BLM purportedly provided no explanation for treatment. But the EA expressly explains that Unit 30-8-17A needs treatment because it has high relative density, contains ladder fuels, lacks understory diversity, and includes dense, small-diameter trees. AR_232 (Figure 1-4). The EA further explains that these conditions create increased susceptibility to severe wildfire, drought stress, insects, and disease, and that reducing stand density allows older trees to "get[] more light, water, and nutrients." AR_230–232. Moreover, Unit 30-8-17A was one of the stops on the public field tour that BLM conducted on May 15, 2025, which Plaintiffs attended. BLM specifically talked about the justification for treatment in structurally complex LSR, with 30-8-17A as an example, and provided Plaintiffs with site-specific modeling results for this unit. *See* AR_5773-75.

Plaintiffs likewise incorrectly assert that BLM "provided no charts, models, or information that depict or explain how logging in mixed-multi canopy and structurally complex units will affect the forest conditions or improve their resilience." Pls.' Br. 14. To the contrary, the EA analyzed in detail how the "proposed treatments affect resistance and resilience of stands to disease, insect infestations, and drought." *See* AR_251-58 (EA Issue 1). The EA also contains extensive modeling, figures, and analysis evaluating post-treatment stand vigor, habitat conditions, wildfire behavior, and forest resilience. *See* AR_258, AR_274-279, AR_284-288. As the stand vigor modeling demonstrated, the selected Alternative 3 "shows the greatest improvement, with 93% of acres in moderate to very-high vigor classes by year 2043," whereas the No Action Alternative "shows a decline, with a rise in low-vigor stands (over 5,100 acres) by 2043, exacerbating susceptibility to drought and insects." AR_257.

Finally, Plaintiffs suggest that treatments in older, structurally complex stands are permissible only where there is an existing insect or disease outbreak. *See* Pls.' Br. 14. Nothing in the RMP imposes such a limitation. The RMP expressly authorizes treatments needed to "protect the health of the stand and adjacent stands,"[7] AR_57029, and BLM explained in response to comments that the "RMP management direction authorizes treatment as preventative measures; it does not require a pathogen, disease, or insect to be present before taking action." AR_140. Plaintiffs' interpretation would produce the untenable result that BLM must wait until stands are actively declining before undertaking preventative management. In any event, aerial surveys already document defoliation and mortality from insects and disease within and adjacent to the project area. *See* AR_18588.

At bottom, Plaintiffs disagree with BLM's scientific judgment regarding how best to maintain and protect older forest habitat subject to increasing climate-driven stresses. But the APA does not permit the Court to substitute Plaintiffs' preferred ecological approach for the agency's expert judgment where, as here, BLM thoroughly analyzed stand conditions, considered habitat impacts, relied on extensive scientific literature and modeling, and articulated a rational connection between the facts found and the management choices made. Plaintiffs therefore cannot demonstrate a likelihood of success on their first FLPMA claim.

### (2) BLM complied with the RMP's 20-Year Standard.

Plaintiffs' second FLPMA claim likewise fails because the 42 Divide Project fully complies with the RMP's requirement governing development of NSO nesting-roosting habitat

---

[7] If BLM intended in the RMP to limit treatments in older complex stands to those needed to treat existing outbreaks, it would have said so explicitly. For example, the RMP elsewhere limits treatments in LSR stands that are not currently nesting-roosting habitat and that do not meet the 20-Year Standard for developing NSO habitat to those "needed to treat infestations or reduce the spread of forest pathogens." AR_57030.

in LSR. Plaintiffs principally argue that the Project authorizes treatments in LSR that will "preclude or delay" development of NR habitat, allegedly in violation of the RMP's 20-year standard and this Court's decision in the Integrated Vegetation Management ("IVM") litigation. But Plaintiffs' argument fundamentally mischaracterizes both the Project and the record. Unlike the analysis criticized in IVM, the 42 Divide Project contains stand-specific habitat analysis, explicit canopy-retention standards incorporated into treatment prescriptions, and robust modeling demonstrating that the challenged treatments do not delay development of NR habitat by twenty years relative to no treatment.

The RMP directs BLM to apply silviculture treatments in LSR stands "that are not northern spotted owl nesting-roosting habitat . . . to speed the development of northern spotted owl nesting-roosting habitat . . . ." AR_57030. BLM must "[l]imit such silvicultural treatments . . . to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment." *Id*. The RMP thus expressly contemplates silvicultural treatments designed to improve long-term habitat development in LSR as long as the treatments do not delay development of NR habitat by twenty years or more compared to no treatment. The record demonstrates that the Project's LSR treatments in non-NR habitat stands satisfy this standard.

First, Plaintiffs incorrectly argue that BLM failed to provide *any* modeling or site-specific information demonstrating compliance with the 20-year standard. *See* Pls.' Br. 16. This assertion is completely belied by the record. Indeed, one of the issues BLM analyzed in detail in the EA was how the proposed treatments would affect the development of northern spotted owl nesting-roosting habitat. *See* AR_258-63 (EA Issue 2). BLM used a variety of datasets to analyze this issue along with information gathered by BLM biologists who conducted field visits to the

proposed action areas to determine the habitat status of forest stands proposed for treatment. AR_258-59. BLM completed approximately 1200 stand exam plots in treatment units. *See* AR_2195-2794. BLM then modeled stand information for each stand's current condition and provided in a summary table. *See* AR_18059-18065.

Next, BLM modeled treatment prescriptions across alternatives to determine compliance with the 20-year standard. *See* AR_008878-80 (memo detailing modeling methodology and results). Based on the individual stand exam data, BLM assigned stand structural classes to each stand, following the structural stages from the PRMP/FEIS. *See* AR_251; AR_48342-43; AR_008879. BLM then selected a median representative stand from each structural class that was not NR habitat to model growth based on the prescribed treatments for each alternative. *Id.*; AR_6363-6365. Finally, BLM performed computer simulations using standard, publicly available models which are refined to regional growing conditions to evaluate stand-development trajectories at multiple checkpoints, including 0-, 20-, 40-, 50-, and 60-years post-treatment. *Id.* Once a stand reached the M-Multi structural classification, it was considered to function as NR habitat, because stands classified as M-Multi and SC-Dev provide large diameter trees and multiple canopies. *Id.*; AR_259-60. *See also* AR_525 (Defining NR habitat).

BLM's analysis demonstrated compliance with the RMP's 20-year standard. The modeling results showed that each alternative results in an increase in available NRF habitat compared to no treatment and on a timeline faster or equal to development with no treatment. *See* AR_262-63; AR_8880. The modeling further demonstrated that "[t]hinning with 10 to 25 percent canopy gaps is the most effective strategy for converting dispersal habitat into functional NRF within 40 to 60 years." AR_260. And "Alternative 3 results in the greatest amount of available NRF." AR_262; AR_260. Thus, "[a]s shown in Figure 3-3, the action alternatives do

not preclude or delay by 20 years or more the development of NRF as directed by the [RMP]." AR_262.

Second, and contrary to Plaintiffs' assertion, BLM's modeling for the 42 Divide Project is fundamentally different from the modeling the court found fault with in the IVM litigation. There, the court found that BLM relied on only three, unrepresentative sample stands, failed to demonstrate that treated stands would "return to the minimum threshold levels for canopy cover and basal area that is required for functional habitat even after 50 years," and improperly offset unfavorable modeling results by artificially adding canopy cover after modeling had already occurred. *Klamath-Siskiyou Wildlands Ctr. v. U.S. BLM*, No. 1:23-cv-00519-CL, 2024 WL 2941529, at *12 (D. Or. May 24, 2024). None of those flaws exist here.

Unlike in IVM, and as explained above, the Project's modeling relied on representative stands derived from site-specific stand exams within the Project area. Moreover, while the modeling in IVM simulated growth based on specific relative density targets, here BLM modeled growth across multiple treatment parameters, including a range of relative densities, skip percentages, group selection openings (gaps), and canopy cover. AR_8879. The final and most distinguishable factor from IVM is that the modeling results for the 42 Divide Project demonstrate compliance with the 20-year standard without any additive canopy cover assumptions. AR_262.

Plaintiffs nonetheless argue that BLM improperly assumed treated stands would retain sufficient canopy cover to function as future NR habitat. Pls.' Br. 18–19. But BLM knows that each unit will retain a minimum canopy cover of 60% (in NR habitat) and 40% (in dispersal habitat) because each treatment prescription is specifically *designed* to limit reductions in canopy cover to those minimum amounts. AR_237; AR_8879. Thus, as BLM explained in the EA,

"[c]anopy cover would not fall below the minimum percentage assigned for each alternative regardless of the relative density." AR_237. This intentional design feature is yet another distinguishing factor from the IVM. Canopy retention is not an unsupported assumption added after the fact. It is a mandatory treatment parameter incorporated directly into the harvest prescriptions.

Plaintiffs also complain that BLM did not disclose information about existing canopy cover in LSR units. Pls.' Br. 18. But BLM's stand attribute table discloses this information. *See* AR_18059-65. This table also demonstrates that the specific units (all in dispersal habitat) that Plaintiffs reference as "appear[ing] to be below canopy targets" are in fact not. *See Id*. (Unit 30-8-5c has 50% canopy cover; Unit 30-8-5F has 51%; Unit 30-8-5J has 54%; Unit 30-8-9C has 80%; and Unit 30-8-9L has 82%). Plaintiffs further question BLM's inclusion of units that have a relative density under 40%. *See* Pls.' Br. 19. But the EA discloses that there are 18 young stands that are within the target relative density range. AR_228. BLM explained the need for treatment in these stands "to create small canopy gaps and promote stand complexity, allowing for conditions conducive to create a structurally complex forest. Since treatments only occur every 15 to 20 years, acting now helps keep these stands within the desired range longer." AR_229.[8]

Finally, Plaintiffs argue that BLM's modeling assumptions were unreasonable because the simulations did not incorporate stochastic events such as windthrow, snow break, insect/disease outbreaks, or small-scale fires. Pls.' Br. 17–18. That argument misunderstands both the purpose of the modeling and the comparative nature of the RMP standard. The RMP

---

[8] BLM also stopped at two of these young LSR units on the public field tour and discussed in detail the treatment objectives, assumptions, and prescriptions for these types of stands. *See* AR_5777-79; AR_5767.

requires comparison of habitat development "as compared to development without treatment." AR_57030. BLM's modeling appropriately compared treated and untreated stand-development trajectories using the same baseline assumptions across all modeled scenarios. The purpose of the simulations was not to predict every possible future disturbance event over sixty years, but rather to evaluate the comparative effects of treatment versus no treatment on habitat development.

Because stochastic events such as wildfire, windthrow, and ice storms are inherently unpredictable, there is no reliable basis for assigning such events to one modeled alternative but not another. More importantly, those risks would apply across all alternatives analyzed, including the no-action alternative. *See* AR_259. Thus, incorporating stochastic disturbances into the simulations would not alter the comparative growth trajectories underlying the 20-year analysis. The relevant question is whether treated stands develop NR habitat later than untreated stands—not whether all stands may someday be affected by unpredictable disturbance events.

Ultimately, Plaintiffs' FLPMA arguments appear to stem from their fundamental confusion about what the 42 Divide Project does and what BLM's analysis demonstrates regarding the Project's effects. This confusion, however, is easily remedied by a more careful and thoughtful reading of the EA and the administrative record. Moreover, it is not the Court's job to second guess the agency's expert conclusions, especially where Plaintiffs have presented no reasoned basis for doing so. Rather, "when an agency undertakes technical scientific analyses, as with the development of models to help analyze a problem, the court's deference to the agency's judgment is at its peak." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1107 (9th Cir. 2016). Because the record demonstrates a rational connection between the facts found

and the BLM's conclusions, Plaintiffs cannot demonstrate a likelihood of success on their FLPMA claims.

### B. The 42 Divide Project Complies with NEPA.

Plaintiffs likewise fail to demonstrate a likelihood of success on their NEPA claims. Plaintiffs' NEPA claims center on the effects to fire risk from the Project. But like with their FLPMA claims, Plaintiffs' arguments misconstrue the Project and completely ignore the extensive analysis BLM undertook in the EA addressing fire risk and associated impacts to local communities and forest resilience.

Moreover, *all* of Plaintiffs' case law in their NEPA section pre-dates *Seven County's* "course correction" that reaffirmed deference as "[t]he bedrock principle of judicial review in NEPA cases." 605 U.S. at 185 (citing cases); *Friends of Animals v. Bergum*, 164 F.4th 738, 750 (9th Cir. 2026); *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025). Viewed under the correct standard of review most recently articulated in *Seven County*, Plaintiffs fail to meet their burden to show BLM's NEPA analysis is arbitrary and capricious.

### (1) BLM applied the relevant regulations and rationally determined that an EIS is not required.

Plaintiffs fail to meet their burden to show that BLM's decision not to prepare an EIS was arbitrary and capricious.

As an initial matter, NEPA's implementing regulations have been in flux. In July 2020 the Council on Environmental Quality ("CEQ") revised how agencies consider whether the effects of a proposed action are significant. 40 C.F.R. § 1501.3(b) (2020). CEQ replaced the "context" and "intensity" factors from the prior regulations with a requirement to analyze the potentially affected environment and degree of effects of the action. *Compare* 40 C.F.R. § 1508.27 (1978) *with* 40 C.F.R. § 1501.3(b)(1), (2) (2020). When considering the first element—

the potentially affected environment—agencies consider the affected area and its resources. 40 C.F.R. § 1501.3(b)(1) (2020). When considering the second element—the degree of effects—agencies look at "short- and long-term effects," "beneficial and adverse effects," "[e]ffects on public health and safety," and "[e]ffects that would violate Federal, State, Tribal, or local laws protecting the environment." 40 C.F.R. § 1501.3(b)(2) (2020). CEQ has since removed all its NEPA regulations. 91 Fed. Reg. 618, 622 (Jan. 8, 2026).

BLM considered the 2020 regulations, as amended, as guidance when it evaluated the Project's environmental effects. *See* AR_22-32 (FONSI, addressing potentially affected environment and degree of effects); AR_234 (stating that BLM considered CEQ's rescinded regulations as guidance). BLM considered both the potentially affected environment (AR_23-24), the degree of effects on the four areas required by the regulations (AR_24-31), and a fifth area directed by departmental policy (AR_31-32, effects on the quality of life of the American people). *See also* AR_4699 (Department of the Interior's NEPA Handbook). Based on this review, BLM issued a Finding of No Significant Impact ("FONSI") that reasonably determined the Project's environmental effects are not significant within the meaning of NEPA and that an EIS was not required. The FONSI "provide[s] a convincing statement of reasons why the Project's environmental effects would not be significant" and is not arbitrary and capricious. *Friends of Animals*, 164 F.4th at 758 (interpreting 40 C.F.R. § 1501.3(b)(1) (2020)); *see also Klamath Forest All. v. U.S. Forest Serv.*, 746 F. Supp. 3d 761, 778 (N.D. Cal. 2024) (same), *aff'd sub nom. Am. Whitewater v. U.S. Forest Serv.*, 2025 WL 2945591 (9th Cir. Oct. 8, 2025).

Plaintiffs' argument that an EIS is required fails for three reasons. *First*, Plaintiffs apply the wrong regulations to the Project decision. They cite no regulations in their NEPA section and instead rely on cases interpreting the superseded 1978 NEPA regulations' "context" and

"intensity" factors. 40 C.F.R. § 1501.3(b)(1), (2) (2020); *see* 40 C.F.R. § 1506.13 (2020) (effective date); 85 Fed. Reg. 43,304, 43,373 (July 16, 2020).[10] Plaintiffs also cite the Department of the Interior's 2026 NEPA handbook to allege that the "intensity" factor is the same as "degree of effects." Pls.' Br. 24. But the handbook provides no support for this argument. The handbook identifies five criteria to aid in determining the degree of effects; it says nothing about retaining any of the ten intensity factors from the rescinded regulations. AR_4699. Plaintiffs' failure to apply the correct regulations is dispositive of their allegation that an EIS was required.

*Second*, even if the Court were to consider Plaintiffs' arguments based on the rescinded context and intensity factors, they fail. Regarding the rescinded context factor, Pls.' Br. 21-22, BLM considered that other large wildfires burned near the Project area. BLM specifically mentioned the Horse Prairie and Douglas Complex fires in the purpose and need (AR_232) and the Archie Creek fire in its methodology for fuel reduction (AR_280). BLM also considered that the Project is located near developed areas and homes in Camas Valley. AR_278 (modeling fire in the wildland urban interface). BLM responded to public concerns about treatments near homes and adopted mitigation measures to reduce the risk of wildfire, such as using a combination of

---

[9] Plaintiffs rely heavily on *KS Wild*, 2024 WL 2941529. The project at issue in this non-binding decision was issued under the 1978 regulations. *See KS Wild*, 2024 WL 2941529, at \*14-17 (addressing context and intensity factors); *id*. at \*6 (stating that BLM initiated scoping in July 2019); *see also* 40 C.F.R. § 1506.13 (2020) (The 2020 regulations "apply to any NEPA process begun after September 14, 2020.").

[10] Plaintiffs rely heavily on *KS Wild*, 2024 WL 2941529. The project at issue in this non-binding decision was issued under the 1978 regulations. *See KS Wild*, 2024 WL 2941529, at \*14-17 (addressing context and intensity factors); *id*. at \*6 (stating that BLM initiated scoping in July 2019); *see also* 40 C.F.R. § 1506.13 (2020) (The 2020 regulations "apply to any NEPA process begun after September 14, 2020.").

FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION          22
*Cascadia Wildlands, et al., v. BLM*, Case No. 6:26-cv-00126

treatments to lower stand densities and prescribed fire following treatments. AR_521-24

(mitigation); *see, e.g.*, AR_75, 164 (response to comments).

Regarding the rescinded intensity factors, Plaintiffs cite to their own public comments to

assert that "BLM's approach to fire is highly controversial and scientifically uncertain."[11] Pls.'

Br. 22-23. But even under the prior NEPA regulations, public opposition to a proposal did not

equate to significance, nor did disagreement among experts. *Greenpeace Action v. Franklin*, 14

F.3d 1324, 1333-34 (9th Cir. 1992); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d

976, 986-87 (9th Cir. 1985). BLM considered public comments and addressed the science around

fire risk. *See, e.g.*, AR_58, 202, 207, 229, 232, 278, 52529-41.[12] Agencies have always had the

discretion to rely on their own experts. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378

(1989) ("When specialists express conflicting views, an agency must have discretion to rely on

the reasonable opinions of its own qualified experts even if, as an original matter, a court might

find contrary views more persuasive."); *Seven County*, 605 U.S. at 182 (a reviewing court must

---

[11] Plaintiffs' reference to two journal articles is misleading. *See* Pls.' Br. 23 ("'[M]ore open conditions and more intensive forest management led to accelerated levels of fire severity (Lesmeister. 2019, Zald. 2018)'"). The quoted text is from their own comments on the IVM project, not from the cited journal articles. *See* AR_3003. Neither of the cited studies stand for the proposition that Plaintiffs state. *See* 52536 (Zald study finding that "intensively managed *private industrial* forests burned at higher severity than older federal forests managed by the BLM" (emphasis added)). Moreover, BLM addressed Plaintiffs' referenced studies in the EA. *See* AR_229, 232, 278.

[12] Plaintiffs rely on *Bark v. U.S. Forest Service* to argue there is scientific controversy about the proposed treatments. Pls.' Br. 23 (citing 958 F.3d 865, 870-71 (9th Cir. 2020). The Ninth Circuit subsequently distinguished and narrowed *Bark. Earth Island Inst. v. Muldoon*, 82 F.4th 624, 639 (9th Cir. 2023); *see also Friends of Big Bear Valley v. U.S. Forest Serv.*, 776 F. Supp. 3d 824, 832-33 (C.D. Cal. 2025). Moreover, *Bark* is readily distinguishable because unlike in that case, BLM addressed the scientific literature and the Project involves thinning followed by prescribed burns. *Earth Island*, 82 F.4th at 639-40 ("[T]he fact that the *Bark* thinning would not be followed by a prescribed burn was one of the reasons why we concluded that the scientific evidence demonstrated that a significant controversy existed."); AR_ 000521-24 (post-harvest fuels treatment include prescribed burning).

be at its "most deferential" when an agency makes "predictive or scientific judgments, and decides what qualifies as significant").

*Third*, the Project EA tiered to the 2016 PRMP/FEIS, which already analyzed and grappled with the science regarding the effects of commercial thinning, fuels reduction, wildfire risk, and post-harvest activity fuels associated with implementing the RMP. AR_234; AR_22-23. NEPA does not require BLM to prepare a new EIS every time it implements site-specific projects consistent with effects already analyzed in the PRMP/FEIS. *Cascadia Wildlands*, 153 F.4th at 903 (finding that BLM was not required to prepare an EIS for a logging project where the EA tiered to analysis in the 2016 PRMP/FEIS). BLM's analysis showed that the effects of the project on fire hazard and risk are within the effects considered in the PRMP/FEIS and therefore do not present significant effects requiring preparation of an EIS. AR_26-27, 273-279.

Plaintiffs nonetheless complain that BLM "selected the alternative with the greatest increase in fire risk and severity to homes and communities in Camas Valley." Pls.' Br. 24. But Plaintiffs challenge neither the Project's purpose and need nor the range of alternatives examined. They also mischaracterize the Selected Alternative. BLM explained that "[w]hile Alternative 3 alone *initially* presents higher residual risk due to the extent of regeneration harvest, the inclusion of the Sub-Alternative significantly mitigates this risk by treating additional acreage strategically located near roads, ridgelines, and high-value habitat." AR_589 (emphasis added). And "[m]odeling results show that the Selected Alternative reduces modeled fire size and flame lengths to levels comparable to or better than other action alternatives." *Id*. Ultimately, BLM concluded that "[t]he Selected Alternative provides the most comprehensive and balanced approach to achieving the Project's objectives, including improving forest health and resilience, contributing to the ASQ, reducing wildfire risk, and maintaining or enhancing

habitat for special status species." AR_588. And importantly, BLM's choice, which weighs various benefits against potential effects, "is a quintessential matter of agency judgment that [courts] cannot disturb on NEPA review so long as the agency considered the relevant information and based its conclusion on such information." *Cascadia Wildlands*, 153 F. 4th at 904.

### (2) BLM adequately analyzed the effects of wildfire severity.

Plaintiffs also allege BLM did not analyze (1) the impacts to projects on public health and safety of local communities and (2) the agency's capacity to manage and mitigate wildfire risk. Pls.' Br. 24-27. Plaintiffs are wrong on both points.

As the Supreme Court and Ninth Circuit recently made clear, in determining whether a document "complied with NEPA, a court should afford substantial deference to the agency. "That includes deferring to the agency regarding what level of detail is required, what alternatives are feasible, and the scope of the environmental effects that the NEPA document will address." *Cascadia Wildlands*, 153 F.4th at 903 (citing *Seven Cnty.*, 605 U.S. at 182-83).[13] "[A]n agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting NEPA documents." *Id.* (citing *Seven Cnty.*, 605 U.S. at 182-83).

BLM adequately analyzed the Project's effects on public health and the safety of local communities. AR_491-943 (Issue T). With respect to wildfire risk to local communities, BLM explained how proposed treatments would alter fire hazard levels during wildfire suppression and overall wildfire risk. AR_266-78 (Issue 5). BLM acknowledged that the Project is located

---

[13] *Cascadia Wildlands* found *Seven County's* "teachings [about an EIS] fully applicable" to an EA. 153 F.4th at 903.

near developed areas and homes in Camas Valley. AR_278. The effects of variable retention harvest in the HLB were fully analyzed in the FEIS for the 2016 RMP. AR_273; *see* AR_055136. Additionally, BLM mailed letters about the Project to adjacent landholders and water rights holders. AR_10341-43, 10156-57. BLM also held a well-publicized public field trip to the Project area in May 2025. AR_5800-02, 5803, 5795 (announcing the field trip on the agency's website and in local media). None of these efforts generated any feedback from residents besides the two associated with Plaintiffs.

BLM reasonably analyzed the effects of mitigation in a sub-alternative for fuel reduction treatments. AR_247-48. BLM also expressly incorporated mitigation measures into the Project to reduce the risk of wildfire. AR_521-24 (Post-harvest Activity Fuels Treatments). Plaintiffs wrongly claim the Project "is entirely dependent on future mitigation that requires sufficient funding and staff." Pls.' Br. 26. The post-harvest fuels treatment mitigation is expressly incorporated as provisions 44(E) and 44(F) of the timber sale prospectuses and contracts, which means that the purchaser is *required* to complete fuels treatment mitigation. Jensen Decl., Dkt. No. 21-6, ¶ 3 (providing five timber sale prospectuses), *see, e.g.*, Dkt. No. 21-6, Ex. 1-014-016; Ex. 2-013-015; Ex. 3-017-019; Ex. 4-016-018; Ex. 5-019-021 (provisions 44(E) and 44(F)).

BLM reasonably considered the Project's effects on the public health and safety of local communities and the agency's capacity to manage and mitigate wildfire risk. *Seven Cnty.*, 605 U.S. at 182-83; *Cascadia Wildlands*, 153 F.4th at 903. While Plaintiffs may disagree with BLM's decision to authorize the Project, "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Seven Cnty.*, 605 U.S. at 173; *Cascadia Wildlands*, 153 F.4th at 904 ("NEPA does not set substantive

environmental requirements; it requires only analysis and disclosure of potential environmental impacts.").

In sum, Plaintiffs have not met their burden to show a likelihood of success on their NEPA claim.

## II.      Plaintiffs Have Failed to Demonstrate that they Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

Plaintiffs also fail to satisfy their burden to demonstrate likely irreparable harm absent preliminary injunctive relief. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). Plaintiffs therefore must establish that irreparable injury is "likely," not merely speculative. *Id*. Moreover, injunctive relief does not follow as a matter of course merely because a plaintiff alleges harm to the environment. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090-91 (9th Cir. 2015).

Plaintiffs have not shown how their interests will be irreparably harmed by the 42 Divide Project. Irreparable harm is not presumed simply where there are environmental impacts caused by logging, and the mere fact that logging is occurring in areas where declarants have visited or near declarants' properties is not sufficient. *Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1195 (D. Mont. 2013), *aff'd*, 767 F.3d 936 (9th Cir. 2014) ("[T]imber cutting is not inherently damaging to forests and irreparable harm does not automatically arise from all environmental impacts caused by logging."); *see also Earth Island Institute v. Carlton*, 626 F.3d 461, 474 (9th Cir. 2010).

Plaintiffs' declarations largely consist of generalized assertions that they enjoy visiting mature forests in the Project area and prefer that those forests remain untreated. Pls.' Br. 28-29;

*See, e.g.*, Cowen Decl. ¶ 22 ("BLM logging practices that remove ancient forests that provide northern spotted owl habitat directly harm my personal hobbies and professional interests"); LeGue Decl. ¶ 23 ("The natural beauty and wildlife values of the mature and old trees and diverse forests found here will be irreversibly damaged by logging."). But as explained in Section I.A(1), *supra*, treatments in older LSR stands are specifically designed to protect and improve the health of older forest stands and speed the development of northern spotted owl habitat by increasing resistance to stand-replacing wildfire and reducing susceptibility to drought, insects, and disease.

Thus, Plaintiffs cannot establish irreparable harm merely by pointing to the fact that treatments will occur in LSR. The challenged treatments are specifically intended to maintain and improve the long-term ecological conditions Plaintiffs claim to value. And Plaintiffs' own briefing undermines their assertion that the challenged forest-management activities inherently cause irreparable environmental harm. Plaintiffs acknowledge that they support "restor[ing] natural ecosystem processes to forests that have departed from historic conditions, including thinning in young, dense plantations." Pls.' Br. 1–2.

Moreover, general allegations of harm to NSO habitat, such as those asserted by Plaintiffs, are insufficient to establish irreparable harm, because such general allegations do not address the circumstances of the proposed project. *See Friends of Bitterroot v. Marten*, No. CV 20-19-M-DLC, 2020 WL 2062139, at *2 (D. Mont. Apr. 29, 2020) (criticizing "stock allegations of harm"). For example, one of Plaintiffs' declarants expresses concern about the impacts of logging and road building on particular owl pairs in a specific core use area. *See* Decl. Reid ¶¶ 10-11. But these "concerns" are not sufficient to establish irreparable harm, especially because

the FWS concluded in its Biological Opinion that "the proposed action will not negatively impact the spotted owl survival and reproduction at this site." AR_745.

With respect to units in the HLB, Plaintiffs' can have no expectation of maintaining "undisturbed" forest conditions because that expectation is fundamentally inconsistent with the governing management framework for these lands. The HLB is specifically allocated for sustained yield timber production under the RMP and the O&C Act. The Project's variable-retention harvest therefore occurs in an area where forest disturbance and timber harvest are not only anticipated, but required. Plaintiffs cannot plausibly claim irreparable injury based merely on the fact that logging will occur in an area specifically designated for active timber management.

Third, Plaintiffs' wildfire-risk allegations do not establish irreparable harm. Plaintiffs repeatedly argue that the Project could temporarily increase fire hazard because of activity fuels. But the record demonstrates that BLM expressly analyzed those risks and incorporated mandatory mitigation measures to reduce them. *See supra*, section I.B.(2). Importantly, Plaintiffs' assertions regarding future wildfire behavior are necessarily speculative. Whether a wildfire will ignite, where it will occur, under what weather conditions it may burn, and how treated versus untreated stands would respond are all contingent future events dependent on innumerable variables. Plaintiffs cannot establish irreparable harm merely by hypothesizing that a wildfire might occur in treated areas before fuels reduction is completed. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988) (speculative future injuries insufficient to establish irreparable harm).

Plaintiffs fail to account for the environmental harms likely to result from delaying the Project. The record demonstrates that untreated stands in the Project area are increasingly

vulnerable to stand-replacing wildfire, drought stress, insects, and disease because of high stand density and ladder fuels. AR_230–232; AR_254–257. The Project was specifically designed to reduce those risks and improve long-term forest resilience. AR_228–233. Delaying implementation therefore risks perpetuating the very forest conditions BLM determined are contributing to increased wildfire severity and declining stand vigor.

Finally, mere allegations of NEPA violations, without some actual harm to Plaintiffs' interests, do not demonstrate irreparable harm. *Cottonwood Envtl. L. Ctr.*, 789 F.3d at 1091 ("We must therefore conclude that there is no presumption of irreparable injury where there has been a procedural violation in ESA cases."); *N. Cheyenne Tribe*, 503 F.3d at 843 ("[I]njunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found."); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[T]here is no presumption of irreparable harm in procedural violations of environmental statutes."). As the Supreme Court recent explained, even if a NEPA analysis "falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project." *Seven Ctny.* 605 U.S. at 185. Moreover, as described above, Plaintiffs have not demonstrated that BLM violated any NEPA procedures. *See* section I.B., *supra*.

In sum, Plaintiffs have not clearly shown that they would be irreparably harmed absent injunctive relief.

## III. Plaintiffs Have Failed to Demonstrate that the Balance of the Harms and the Public Interest Weigh in Favor of Injunctive Relief.

The final two preliminary injunction factors—the balance of equities and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both factors strongly weigh against the extraordinary relief Plaintiffs seek.

Plaintiffs requested injunction would substantially halt implementation of the 42 Divide Project and disrupt BLM's broader statutory obligations under the O&C Act and the 2016 RMP. As BLM South River Field Manager James Halperin explains, timber sale planning and implementation occur years in advance and operate through a carefully sequenced pipeline designed to maintain sustained yield timber production while simultaneously implementing fuels reduction and forest restoration treatments. Halperin Decl. ¶ 14. Enjoining the Project would not simply pause a discrete set of activities; it would force BLM to divert limited staff and resources away from future projects and toward contract suspension, litigation response, re-analysis, and re-initiation efforts. *Id*. Such disruption would "cause cascading delays in other projects that interfere with BLM's ability to maintain sustained yield from HLB lands, reduce hazardous fuels across all lands including reserves, and meet long-term forest management objectives." *Id*.

The public interest strongly favors allowing BLM to continue implementing the Project consistent with the governing RMP. Congress expressly directed BLM to manage O&C lands "for permanent forest production" under sustained yield principles while also protecting watersheds and contributing to the economic stability of local communities. 43 U.S.C. § 2601. The 2016 RMP represents the culmination of a years-long planning and environmental review process designed to balance those statutory obligations with conservation and recovery of ESA-listed species. Halperin Decl. ¶ 8. The 42 Divide Project directly implements those objectives by contributing to the District's declared ASQ, conducting fuels reduction, and promoting long-term forest resilience and northern spotted owl habitat development. *Id*. ¶¶ 6–9.

Indeed, the Project is particularly important because BLM has substantially underperformed the projected treatment and harvest levels anticipated under the RMP. From 2017 through 2024, the Roseburg District implemented less than half of the projected harvest

expected during the first decade of the RMP. *Id*. ¶ 6. Likewise, the District has completed only 499 acres of treatment in LSR-Dry since 2016 despite the RMP's direction to treat at least 4,500 acres per decade. *Id*. The RMP requires treatment of LSR-Dry to restore fire adapted ecosystems, reduce stand densities, increase forest health, and increase resilience not only to fire, but also other fire disturbances. *Id.* The 42 Divide Project would contribute 3,315 acres toward that target alone. *Id*. ¶ 9. Enjoining the Project would therefore materially impair BLM's ability to fulfill the restoration and resiliency objectives embedded in the RMP itself.

The Project also serves important public safety and ecological objectives. As discussed above, the record demonstrates that untreated stands within the Project area are increasingly vulnerable to stand-replacing wildfire, drought stress, and insect and disease outbreaks because of dense stand conditions and altered disturbance regimes. *Id*. ¶¶ 6, 29. The Project's treatments—including commercial thinning, selection harvest, understory treatment, and fuels reduction—are intended to reduce stand density, protect large trees, increase heterogeneity, and improve resilience to wildfire and climate stressors. *Id*. ¶¶ 6, 29–30. Ecological forestry principles incorporated throughout the RMP specifically rely on thinning and active management to restore more fire-resilient forest conditions. Id. ¶ 30.

Importantly, the public interest is not limited to timber production alone. The Project also includes approximately 1,950 acres of fuels reduction treatment and associated restoration work, including weed treatment, and brush disposal. *Id*. ¶¶ 7, 15. The Project further includes road management and improvement activities intended to reduce chronic sedimentation sources within Project watersheds. *Id*. ¶ 15. Delaying these activities would postpone not only timber production, but also forest restoration and wildfire resiliency work that BLM determined is necessary to improve long-term forest health and public safety.

The economic harms from an injunction would also be substantial and immediate. To date, BLM has already auctioned six timber sales associated with the Project totaling more than $5 million. *Id*. ¶ 10. Several contracts are already fully executed and binding. *Id*. If the Project is enjoined, BLM would suspend performance under those contracts and likely postpone additional planned sales. *Id*. ¶¶ 11, 13, 19. Such delays undermine market confidence, reduce bidder participation, and materially affect bid prices. *Id*. ¶ 13.

Those harms extend well beyond the federal government. The Project supports local mills, contractors, truckers, road crews, logging operators, and related businesses throughout Douglas County, which BLM identified as "extremely high" in dependence on federal forest management and wood products industry employment. *Id*. ¶ 15. BLM estimates that the Project will ultimately generate approximately 170 jobs in the local economy. *Id*. The Project has already sold 26.2 million board feet, corresponding to approximately 60 jobs. *Id*. Halperin further explains that delaying the Project would likely result in sawmill downtime, reduced employee hours, and potential layoffs if purchasers cannot secure replacement log supplies. *Id*. ¶ 18. Numerous subcontractors scheduled to perform weed treatment, road reconstruction, trucking, slash disposal, and logging work would likewise be affected. *Id*.

An injunction would also directly impair county revenues. Timber receipts from O&C lands are apportioned such that western Oregon counties receive 75% of receipts. *Id*. ¶ 16. BLM estimates that delaying the six timber sales currently under contract would postpone approximately $630,996 in anticipated county payments during the current budget cycle. *Id*. ¶ 23. Those funds support county schools, libraries, public safety, and road maintenance. *Id*. The Project as a whole is estimated to generate more than $12 million in payments to O&C counties. *Id*.

Timing considerations further weigh heavily against injunctive relief. A preliminary injunction lasting even four to six months would effectively eliminate the entire 2026 operating season. *Id*. ¶ 17. Seasonal operating restrictions limit road work during wet conditions and timber operations during fire season. *Id*. Because road improvements must occur before winter operations can proceed, even a temporary injunction would likely delay operations for an entire year. *Id*. The Project currently includes approximately 43.75 miles of road work across 33 units. *Id*. BLM's experience shows purchasers are unlikely to mobilize equipment for fragmented or uncertain operations under litigation-driven restrictions. *Id*. ¶¶ 24–25.

Further, several timber sales are constrained by expiring marbled murrelet survey clearances. *Id*. ¶ 26. Delays caused by an injunction could require BLM to reinitiate costly multi-year surveys and potentially cancel timber sales altogether. *Id*. Those additional surveys would divert staff time and funding away from future projects needed to comply with the O&C Act and the RMP. *Id*.

All of these considerations strongly favor denying preliminary relief here. As discussed above, Plaintiffs' alleged harms are largely speculative and based on disagreement with BLM's scientific judgments regarding forest resiliency and fuels management. Meanwhile, the harms to BLM, local governments, timber purchasers, local workers, and the broader public from an injunction are concrete, immediate, and substantial. Plaintiffs seek to halt implementation of a years-long forest management project designed to advance wildfire resilience, forest restoration, NSO habitat development, and congressionally mandated sustained-yield timber management based on speculative harms and Plaintiffs' failure to understand the Project's prescriptions and effects. The balance of equities and public interest weigh decisively against that extraordinary remedy.

## IV.    Plaintiffs Should be Required to Post a Bond.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. of Civ. P. 65(c).  Although a nominal bond may be appropriate in public interest cases, "each case is fact-specific" and "[s]o long as a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion."  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *see also Save the Park and Build the School v. Nat'l Park Serv.*, No. 3:20-cv-1080-LAB-AHG, 2020 WL 4260801, at *7 (S.D. Cal., July 24, 2020) (ordering plaintiff to show cause why the Court should not set a bond of $20,000); *Klamath-Siskiyou Wildlands Ctr. v. Heywood*, No. 2:09-cv-02252-JAM-GGH (E.D. Cal. Aug. 28, 2009) (Dkt. No. 40) (requiring a bond to support a temporary restraining order); *Sierra Club v. Bosworth*, 3:05-cv-397-CRB (N.D. Cal. Aug. 10, 2005), Dkt. No. 62) (directing plaintiffs to post a $5,000 bond).

Based on current production rates and contract information, BLM estimates that delaying ongoing operations for six months could result in approximately $26,825.38 in costs to the United States. *See* Halperin Decl. ¶ 33.  These estimates do not include additional operational inefficiencies, contractor disruptions, or the economic impacts associated with loss of seasonal operating windows.  If the Court grants injunctive relief, it should impose a meaningful bond to partially offset the financial harms associated with project delay.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 22nd day of May, 2026.

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/ Shannon Boylan*
SHANNON BOYLAN (D.C. Bar No. 1724269)
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
150 M St NE
Washington, D.C. 20002
Tel: (202) 598-9584; Fax: (202) 305-0506
E-mail: shannon.boylan@usdoj.gov

*Attorney for Defendant*