UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit organization, OREGON WILD, an Oregon non-profit organization, UMPQUA WATERSHEDS, an Oregon non-profit organization,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency,<br><br>        Defendant. | Case No. 6:26-cv-00126-MTK<br><br>**OPINION AND ORDER** |

**KASUBHAI,** United States District Judge:

Plaintiffs Cascadia Wildlands, Oregon Wild, and Umpqua Watersheds filed this action against Defendant U.S. Bureau of Land Management ("BLM") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging BLM's approval of the 42 Divide Forest Management Project ("42 Divide Project"). Plaintiffs allege that BLM violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, and the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 *et seq.* Defendant-Intervenors American Forest Resource Council and Association of O&C Counties subsequently moved to

Page 1 — OPINION AND ORDER

intervene in this litigation, which this Court allowed. ECF Nos. 8, 16. Before the Court are Plaintiffs' Motion for Preliminary Injunction and Defendant and Defendant-Intervenors' Motions to Strike. For the reasons below, Plaintiffs' Motion for Preliminary Injunction is granted in part and the Motions to Strike are denied.

## BACKGROUND

Plaintiffs allege that Defendant BLM, in authorizing the 42 Divide Project, *see* Administrative Record ("AR") 583-603, acted arbitrarily and capriciously in violation of FLPMA and NEPA. The Court begins by summarizing the relevant statutory and regulatory framework and the facts underlying this action.

## I.    Statutory and Regulatory Background

### A.    FLPMA and the O&C Act

BLM lands are subject to FLPMA. 43 U.S.C. § 1732(a). Under FLPMA, the BLM must prepare Resource Management Plans ("RMPs") for its districts. 43 U.S.C. § 1712. RMPs "are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2. The BLM must manage lands governed by FLPMA "under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). By contrast, lands that are governed by the Oregon and California Lands Act of 1937 ("O&C Act")—including 7,012 acres of land within total Project area, AR 224—are managed for "permanent forest production . . . in conformity with the princi[ple] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties . . . ." 43 U.S.C. § 2601; *see also Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990) (upholding a BLM interpretation that the O&C Act establishes timber production as the dominant use on O&C

lands). O&C lands are nevertheless subject to later enacted statutes like NEPA and FLPMA. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1134-35 (9th Cir. 2023) (citing *Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993)); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, No. 1:19-cv-02069-CL, 2021 WL 4462886, at *2 (D. Or. Sept. 29, 2021) ("[FLPMA] is inapplicable to O&C timberlands only to the extent that its provisions conflict or are inconsistent with provisions of the O&C Act.") (citations omitted).

The development of an RMP "is considered a major Federal action significantly affecting the quality of the human environment" requiring the preparation of an Environmental Impact Statement under NEPA. 43 C.F.R. § 1601.0-6; *see* AR 54835-56948. Further site-specific actions implementing the RMP must conform to the governing RMP and require compliance with NEPA. 43 C.F.R. § 1610.5-3(a); AR 56961.

### B.    NEPA

NEPA's purpose is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). NEPA's procedural requirements "do[] not mandate particular results, but simply prescribe[] the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

To that end, NEPA requires federal agencies to issue an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment," considering the environmental impact of the action and its alternatives. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (quoting 42 U.S.C. § 4332(C)). To

determine whether an action will have significant environmental impacts, an agency may first conduct an environmental assessment ("EA"). *Id.* "An EA is a 'concise, public document' providing 'sufficient evidence and analysis' for the agency to determine 'whether to prepare an environmental impact statement.'" *Id.* (quoting 40 C.F.R. § 1508.9(a)(1)). If an agency concludes a project has no significant impact, it issues a finding stating so. *See, e.g.*, *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014).

## II.    Factual Background

### A.    2016 RMP

In 2016, BLM adopted the Southwestern Oregon RMP ("2016 RMP"). AR 56953. The 2016 RMP "provides direction for management of resources on approximately 1.2 million acres of BLM-administered lands in the Klamath Falls Field Office of the Lakeview District, the Medford District, and the South River Field Office of the Roseburg District." AR 56951. The purposes of the 2016 RMP include all the following:

> Provide a sustained yield of timber . . . [c]ontribute to the conservation and recovery of threatened and endangered species, including—[m]aintaining a network of large blocks of forest to be managed for late-successional forests; and [m]aintaining older and more structurally complex multi-layered conifer forests . . . . [p]rovide clean water in watersheds . . . [r]estore fire-adapted ecosystems . . . [p]rovide recreation opportunities . . . [and c]oordinate management of lands surrounding the Coquille Forest with the Coquille Tribe.

AR 56959.

The 2016 RMP categorizes individual stands across the 1.2 million acres of BLM-administered lands into various land use allocations ("LUAs"), each of which is subject to different management objectives and directions. AR 56961. There are eight different LUAs within the Project boundaries (sorted here based on the percent of the total 42 Divide Project area each LUA comprises): (1) late successional reserve dry ("LSR-dry") (forty nine percent), (2) harvest land base-medium intensity timber area ("HLB-medium") (twelve percent), (3) riparian

reserve dry ("RR-dry") (eleven percent), (4) late successional reserve ("LSR") (nine percent), (5) harvest land base-low intensity timber area ("HLB-low") (eight percent), (6) riparian reserve (RR) (five percent), (7) harvest land base-uneven aged timber area ("HLB-uneven") (four percent), and (8) district designated reserve ("DDR") (two percent). AR 225.

For the Roseburg District (the district relevant to this case), the 2016 RMP set an annual allowable sale quantity of thirty-two million board feet. AR 56963-64. In support of the 2016 RMP, BLM issued a Final Environmental Impact Statement considering the effects of the Southwestern and Northwestern RMPs together, encompassing a total of 2.5 million acres. AR 54837; *see generally* AR 54835-56948. Given the large area and distinct management objectives and direction provided in the 2016 RMP, BLM emphasized that "[o]n-the-ground projects, such as timber sales . . . will undergo additional analysis and decision-making before implementation." AR 56951; *see also* AR 56961 ("The BLM will carry out additional decision-making, including NEPA compliance . . . as appropriate, before authorizing any future actions and implementation decisions.").

### B.     The 42 Divide Project

In December 2025, Defendant BLM authorized the 42 Divide Forest Management Project ("42 Divide Project") to "balance[] sustained-yield timber production in the HLB with resource protection and restoration" and fulfill the objectives of the O&C Act and various policy directives. AR 591 (citing Exec. Order No. 14,225, 90 C.F.R. 11365 (2025–2029); Exec. Order No. 14,239, 88 C.F.R. 17373 (2025–2029). The "decision authorizes forest management, fuels reduction, and associated activities on up to 6,889 acres of BLM-administered lands," AR 583, "located within the South River Field Office of the Roseburg District BLM, in Douglas County, Oregon, north and south of Highway 42 near Camas Valley." AR 224. The stated purpose of the

42 Divide Project is to "provide a sustained yield of timber, restore fire-adapted systems, and contribute to the conservation and recovery of threatened species." AR 225.

On December 18, 2025, BLM completed an EA for the 42 Divide Project ("42 Divide EA"). AR 213. In conformance with its obligations under NEPA, BLM analyzed a no action alternative, four action alternatives, and an action sub-alternative in the 42 Divide EA. *See* AR 21-22. In the end, BLM selected alternative 3—which authorizes "treatment on 278 acres of LSR, 2,768 acres of LSR-dry, 342 acres of RR-Dry, 1,813 acres of HLB, and 127 acres of DDR"—implemented with the Sub-Alternative—which "includes treatment on 464 acres of LSR, 1,249 acres of LSR-dry, 0 acres of RR, 206 acres of HLB, and 29 acres of DDR." *Id.* The Selected Alternative includes 4,397 acres of commercial thinning, 922 acres of selection harvest, 720 acres of variable-retention regeneration harvest (VRH), 839 acres of understory treatment, and eleven acres of pre-commercial thinning. AR 584. Each of these activities is unique and impacts the environment in different ways. As relevant here, commercial thinning, which comprises the majority of the 42 Divide Project as it is currently being implemented, *id.*, involves "[s]tand thinning in which some or all of the cut trees are removed from the stand for timber." AR 57259.

Based on the 42 Divide EA, BLM issued a Finding of No Significant Impact "demonstrat[ing] that the BLM analyzed the Selected Alternative and found that it would not have a significant impact on the human environment" and that, "[t]herefore, th[e] [P]roject does not require an Environmental Impact Statement." AR 590; *see generally* AR 20-212. Since issuing the Finding of No Significant Impact, BLM has auctioned six sales under the project. Jensen Decl. ¶ 3, Exs. 1-6, ECF No. 21-6.

**STANDARDS**

## I.      Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20, 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## II.      The Administrative Procedure Act

Judicial review of agency action is governed by the APA, 5 U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Page 7 — OPINION AND ORDER

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such review is deferential to the agency action taken, the court must not "rubber-stamp" the agency action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is 'arbitrary and capricious.'" *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting *Powell*, 395 F.3d at 1026), "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.''" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

Plaintiffs contend that they satisfy the *Winter* test for each of their four claims and ask the Court to grant preliminary injunctive relief in the form of an order enjoining commercial logging in the 42 Divide Project until this case is resolved. The Court addresses Plaintiffs' claims and, because it finds that Plaintiffs are entitled to partial injunctive relief on one of their claims, whether Plaintiffs should be required to post bond.

## I.      FLPMA Claims

Under FLPMA, BLM must prepare RMPs for its districts. 43 U.S.C. § 1712. RMPs "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2, 43 U.S.C. § 1712. "Once a land use plan is developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.'" *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting 43 C.F.R. § 1610.5–3(a)).

Though this Court's review is deferential, the Court does not defer to an agency interpretation that is "plainly inconsistent with the regulation at issue." *Id.* (quotation marks and citations omitted). Rather, this Court must "engage in a substantial inquiry" and a "thorough, probing, in-depth review" to determine if BLM's conduct satisfied its obligations under FLPMA and the APA. *Id.* (quotation marks and citations omitted). An agency violates FLPMA where it authorizes a plan governed by an RMP but fails to "present a rational connection between the facts found and the conclusions made." *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)); *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 44-45 (9th Cir. 2025).

Here, Plaintiffs allege that the 42 Divide Project violates two RMP management directions applicable to LSR and LSR-Dry LUAs. For the following reasons, the Court finds that Plaintiffs have established (A) serious questions as to whether BLM demonstrated compliance with a management directive in accordance with FLPMA, (B) a likelihood of irreparable injury as to that claim, and (C) that the balance of equities and public interest factors tip heavily in their favor.

A.      **20-Year Standard**

Count 2 of Plaintiffs' FLPMA claim alleges that the 42 Divide EA authorizes activities that violate the 20-Year Standard for developing Northern Spotted Owl nesting-roosting habitat. In LSR,[1] the so-called "20-Year Standard" in the 2016 RMP requires as follows:

> In stands that are not northern spotted owl nesting-roosting habitat, apply silvicultural treatments to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term. Limit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. Allow silvicultural treatments that do not meet the above criteria if needed to treat infestations or reduce the spread of forest pathogens.

AR 57030.

Plaintiffs contend that BLM failed to demonstrate compliance with the 20-Year Standard for three reasons. First, they contend that this case is substantially similar to *Klamath-Siskiyou Wildlands Ctr. v. United States Bureau of Land Mgmt.* ("*KS Wild*"), No. 1:23-CV-01163-CL, 2024 WL 2941529, at *10 (D. Or. May 24, 2024), *report and recommendation adopted,* No. 1:23-CV-00519-CL, 2025 WL 975176 (D. Or. Mar. 31, 2025), in which Judge Clarke found a violation of the 20-Year Standard. Second, Plaintiffs argue that BLM failed to account for natural disturbances in its "no action" analysis, resulting in an inaccurate baseline. Finally, Plaintiffs contend that the 42 Divide EA contained no information about baseline canopy cover, rendering BLM's assumptions unsupportable. For the following reasons, the Court agrees that Plaintiffs' first argument is sufficient at this stage to raise serious questions going to whether BLM complied with the 20-Year Standard and violated FLPMA.

---

[1] Because the 20-Year Standard identically applies to LSR and LSR-Dry stands, the Court sometimes refers to both LUAs collectively as LSR throughout the remainder of this opinion.

Plaintiffs liken this case to *KS Wild*, in which Judge Clarke found that BLM violated the 20-Year Standard in its approval of the Integrated Vegetation Management for Resilient Lands ("IVM") Program because "BLM failed to adequately demonstrate how the impacts of the IVM Program's Intermediate prescription plans will not result in long-term degradation of [Northern Spotted Owl] habitat development." 2024 WL 2941529, at *12. There, BLM concluded the treatments at issue complied with the 20-Year Standard by selecting and modeling three sample stands and determining whether the results were consistent with metrics for nesting-roosting habitat. *Id.* The court found that BLM's determination of compliance with the 20-Year Standard arbitrary and capricious, noting that BLM relied on contradictory assumptions and unrepresentative sample stands. *Id.* In particular, the court noted that the results of the modeling "exhibited that the treated stands could not return to the minimum threshold levels for canopy cover and basal area that is required for functional habitat even after 50 years," and that BLM attempted to "mitigate the model's underestimation" by "assum[ing] a range of 10-20 percent additive canopy cover with natural regeneration post-harvest and at least 10 square feet of additive basal area." *Id.* The court in *KS Wild* did not dispute the reliability of the modeling or data but found that "the overestimation employed by BLM to achieve compliant results relies on a contradictory assumption." *Id.* The court concluded that "[t]he record must show that BLM's analysis was based on accurate information and defensible reasoning," and that because it was not, the plaintiffs were entitled to summary judgment on their FLPMA claim based on the 20-Year Standard. *Id.* at *12-13.

The treatment prescriptions at issue in this case are similar to those at issue in *KS Wild* because, like there, the treatments would bring the average stand relative density down from around 65 percent to 20-45 percent, with 10-25 percent of the unit in gaps. AR 230, 243.

Plaintiffs pointed out the similarities between the projects in public comments, noting that BLM's own modeling for the IVM Program indicated that stands subject to such treatments "did not reach 60% canopy cover until 70 years post-harvest." AR 2997. Northern Spotted Owl nesting-roosting habitat requires at least 60 percent canopy cover. AR 57028 n. 24. Plaintiffs' comments also pointed out that BLM's analyses of similar treatments for the Rogue Gold Forest Management Project showed "the two modeled stands treated with a target of 20 and 35 percent [relative density] did not reach target nesting-roosting canopy cover conditions within 20 years of the No Treatment model. . . ." AR 2997. Given BLM's own modeling showing that treatments similar to those at issue in the 42 Divide Project would not reach the required 60 percent canopy cover within twenty years of a "no treatment" alternative, Plaintiffs demanded that BLM "show its work" and demonstrate how the 42 Divide Project would comply with the 20-Year Standard as to canopy cover. AR 2996-98.

The 42 Divide EA provides a brief description of the methodology and assumptions BLM used to evaluate how the treatments would affect Northern Spotted Owl habitat. AR 258-60. BLM biologists and foresters reviewed stand data to define habitats and then conducted habitat modeling. AR 258-599. In its modeling, BLM made "treatment assumptions" that stands would retain a minimum of 60 percent canopy cover in nesting roosting habitat, and 40 percent canopy cover in dispersal habitat. AR 259. The EA explained that "[c]anopy cover would not fall below the minimum percentage assigned for each alternative regardless of the relative density." AR 237. Summarizing the results of the modeling, BLM concluded that "[h]abitat modeling indicates that dispersal/recruitment develops into [nesting, roosting, and foraging habitat]/[marbled murrelet nesting habitat] at similar rates or sooner than the no action alternative." AR 262.

Page 12 — OPINION AND ORDER

Plaintiffs contend that, particularly in light of prior BLM modeling showing that similar treatments failed to comply with the 20-Year Standard, BLM failed to demonstrate how the 42 Divide Project is different than the project at issue in *KS Wild*. The Court agrees that Plaintiffs have at least raised serious questions as to whether BLM demonstrated compliance with the 20-Year Standard. In particular, the Court is troubled by the assumptions built into the modeling that do not appear to be supported anywhere in the record. While the modeling in *KS Wild* applied additive canopy to mitigate the model's underestimation of canopy cover, the modeling here appears to fix the result in advance by assuming retention of a certain amount of canopy cover. BLM explains that it "knows" that each unit will comply with the minimum canopy cover assumptions because "each treatment prescription is specifically *designed* to limit reductions in canopy cover to those minimum amounts." Def.'s Opp'n 17, ECF No. 23. But BLM does not cite any project design feature that requires that. Instead, the citations BLM provides for that assertion merely point back to portions of the record that explain that the modeling assumes certain canopy cover without explaining why or how. AR 237, AR 8879.

The unsupported assumption that units will retain a minimum level of canopy cover is particularly troubling given BLM's modeling for the IVM Program at issue in *KS Wild* and the Rogue Gold Forest Management Project identified in Plaintiffs' comments. Given prior BLM modeling showing that similar treatments in other projects would not meet the 20-Year Standard, BLM's decision as to the 42 Divide Project is arbitrary and capricious because BLM failed to demonstrate how or why this project is different. Defendant-Intervenors note that the modeling in the IVM Program and Rogue Gold Forest Management Project are not instructive here because "those other two projects have *different* stand characteristics and are located on *different* BLM districts." Defendant-Intervenors' Resp. 25, ECF No. 24. While that may be true, that prior

modeling is sufficient to raise the question: what makes the 42 Divide Project different from those projects? That is the specific question that Plaintiffs raised in their comments, and BLM did not answer it anywhere in its analysis or explain the basis for its assumption that stands would maintain certain minimum canopy cover.

BLM must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43. The unsupported treatment assumptions about canopy cover minimums—particularly when coupled with modeling for similar treatments that showed units subjected to such treatment would not reach the required 60 percent canopy cover within twenty years of a "no treatment" alternative— raise serious questions about whether BLM demonstrated compliance with the 20-Year Standard.

### B.    Irreparable Harm

The Court must now determine whether Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief" on Plaintiffs' 20-Year Standard claim. *Winter*, 555 U.S. at 20. Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), a*brogated in part on other grounds by* Winter, 555 U.S. at 20. Logging, "if indeed incorrect in law, cannot be remedied easily if at all" and "is irreparable for the purposes of the preliminary injunction analysis." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).

Plaintiffs' concern that the 42 Divide Project will harm their interests in the project area is not mere speculation, but imminent, actual, and irreparable harm. *See, e.g.*, Quinn Decl. ¶ 15, ECF No. 21-2 ("If this spur road . . . is constructed, the ability of myself, my family, our

neighbors, and the general public to recreate and enjoy the shade of the large old trees that grace this bucolic hilltop location will be . . . gone, if not forever, then far beyond our lifetimes."); LeGue Decl. ¶ 23 ("The natural beauty and wildlife values of the mature and old trees and diverse forests found here will be irreversibly damaged by logging."), ECF No. 21-5; Cowen Decl. ¶ 25 ("The loss and/or degradation of this place would . . . irreparably harm my . . . interests in the area and the wildlife that inhabit it."), ECF No. 21-3; Reid Decl. ¶ 9 ("Because of my scientific background and my recreational enjoyment of the forests of the Umpqua Watershed, including those in the 42 Divide Harvest Plan, I am deeply concerned by the project and the impact to vital habitat for the spotted owl."), ECF No. 21-4.

There is no question in this case that logging would occur in LSR units under some of the contracts Defendant has already authorized. Logging of the LSR units would harm Plaintiffs' ability to "view, experience, and utilize the [forest] in [its] undisturbed state." *All. for the Wild Rockies*, 632 F.3d at 1135 (holding that a plaintiff can suffer irreparable injury even if "there are other areas of the forest that are not harmed" by a project). Plaintiffs have therefore shown that in the absence of a preliminary injunction, they are likely to suffer irreparable harm to their interests in the 42 Divide Project area.

### C.    Balance of Equities and Public Interest

Where the government opposes a preliminary injunction, the last two factors in the *Winter* preliminary injunction analysis merge, because any harm to the public interest impacts the balance of the equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When irreparable environmental injury "is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545.

Plaintiffs contend that the public interest and balance of hardships tip heavily in their favor. On the issue of public interest, Plaintiffs note that there is a "well-established public

Page 15 — OPINION AND ORDER

interest in preserving nature and avoiding irreparable environmental injury." *All. for the Wild Rockies*, 632 F.3d at 1138 (internal quotation marks and citation omitted). They further argue that such public interest is tangible in this case, as illustrated by more than 1,500 people who commented on the 42 Divide EA to express concern about the impacts of the project. On the issue of the balance of harms, Plaintiffs emphasize the permanent nature of the injury as compared to the temporary nature of the relief they seek at this stage, noting that it would only prohibit commercial logging during the pendency of this litigation.

Defendant BLM contends that the 42 Divide Project is in the public interest because it furthers the Congressional management directives under the O&C Act and FLPMA directives and objectives under the RMP by helping achieve the District's declared allowable sale quantity, conducting fuels reduction, and promoting long-term forest resilience and Northern Spotted Owl habitat development. Defendant BLM also argues that an injunction would result in wide-reaching economic harm to communities that depend on logging for employment and counties that receive revenue from logging. Halperin Decl. ¶¶ 15-16, ECF No. 23-1. Defendant notes that "[a] preliminary injunction of even 4-6 months would eliminate the entire 2026 operating season." *Id.* ¶ 17. Defendant-Intervenors provide further evidence of what they contend is significant economic harm to them from even a temporary delay. In particular, they note that there have already been significant investments made in implementing the sales that already occurred under the 42 Divide Project.

The Court finds that the balance of equities and public interest factors tip heavily in favor of issuing an injunction here because temporary economic harm is insufficient to overcome the public's interest in preserving the LSR units at issue in Plaintiffs' FLPMA claims during the pendency of this litigation, and because of the hardship Plaintiffs would suffer from irreparable

injury to those units. As the Court has already noted, Plaintiffs have demonstrated that irreparable environmental harm in the absence of an injunction is likely. Such permanent and irreparable harm strongly outweighs the temporary economic delay that Defendant and Defendant-Intervenors will face upon the issuance of an injunction narrowly tailored to the harms alleged by Plaintiffs. *See League of Wilderness Defs.*, 752 F.3d at 765 (finding that the balance of equities tips toward a plaintiff who suffers a permanent environmental harm when compared with a defendant who faces temporary economic delay) (citation omitted). That is particularly true here, where the management objectives for the units at issue concern maintenance of nesting-roosting habitat rather than timber production, as would be the case with HLB units. AR 57020; 57028. In addition, the record makes clear that the purchasers were on notice of this litigation and its potential impacts on the timber sales at the time of auction, and in fact were required to sign a "Notice of Litigation Acknowledgement" that noted that "any decision to award the [sale] may be significantly delayed, or operations suspended" due to this litigation. *See, e.g.,* Jensen Decl. Ex. 6 at 2, 15; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017) (lost profits and delay are "the nature of doing business, especially in an area fraught with bureaucracy and litigation"). Finally, the narrow nature of the relief, which would apply only to LSR units, significantly minimizes any economic impact, as four of the six timber sales at issue are located entirely in HLB units. *See* Hammerschmith Decl. ¶ 10, ECF No. 24-2; Spring Decl. ¶ 8, ECF No. 24-4; Kjos Decl. ¶¶ 6, 14, ECF No. 24-5. The public interest and balance of hardship factors tip heavily in Plaintiffs' favor.

### D.     Conclusion

The Court concludes that Plaintiffs have satisfied the *Winter* test with respect to their FLPMA claim based on the 20-Year Standard and are entitled to preliminary injunctive relief related to that claim. The scope of that relief is limited to units actually subject to the 20-Year

Standard—LSR and LSR-Dry stands (collectively, "LSR stands"). *See* AR 57030 (setting forth the 20-Year Standard as management directive applicable to LSR); AR 57032 (incorporating LSR management directives into LSR-Dry directives). Accordingly, the Court enjoins any commercial logging of LSR stands pending the resolution of this litigation. Because Plaintiffs' other FLPMA claim also concerns LSR stands and would afford no greater relief than the relief this Court is already issuing with respect to Plaintiffs' 20-Year Standard FLPMA claim, the Court does not address that claim. *See Fin. Express L.L.C. v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1168 (C.D. Cal. 2008) ("In order to be granted a preliminary injunction, [a plaintiff] only needs to show the requisite combination of probable success on the merits and the possibility of irreparable injury with respect to any one of its claims"). Defendant and Defendant-Intervenors' Motions to Strike the Second Declaration of Madeline Cowen are denied as moot, as the declaration at issue relates to the FLPMA claim the Court declines to address at this stage.[2]

Because Plaintiffs' NEPA claims apply to units beyond the LSR units—and would therefore result in greater relief than the Court has found appropriate under their 20-Year Standard FLPMA claim—the Court turns next to the question of whether Plaintiffs have satisfied the *Winter* test with respect to their NEPA claims.

## II.    NEPA Claims

Plaintiffs allege that BLM violated NEPA by failing to prepare an Environmental Impact Statement for the 42 Divide Project and failing to take a hard look at several environmental factors. Plaintiffs' arguments on the merits of these claims make clear that they are both based on BLM's alleged failure to adequately assess the increased risk of fire and its effects on public

---

[2] To the extent that Plaintiffs decide to use a similar declaration to support their motion for summary judgment, Defendant and Defendant-Intervenors have leave to reraise any applicable objections raised in these motions to strike.

health, safety, and the environment. For the following reasons, the Court finds that Plaintiffs have failed to demonstrate that they are likely to suffer irreparable harm in the absence of a preliminary injunction on these claims, and therefore does not address the other factors of the *Winter* test with respect to Plaintiffs' NEPA claims. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

Plaintiffs rely on the same assertions of irreparable harm as to all four of their claims for relief, generally citing case law on the irreparable nature of injury caused by logging. However, the Court is unconvinced that those same assertions of irreparable harm are as applicable to Plaintiffs' specific NEPA claims as they were to their FLPMA claims. To grant injunctive relief, a district court must find a nexus between the character of the challenged conduct and the alleged irreparable harm. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124-25 (2005) ("[T]he district court conducted a proper analysis of the nexus between the challenged procedure and environmental injury."); *Pappion v. R-Ranch Prop. Owners Ass'n*, 2013 WL 12304743 at *2 (E.D. Cal. Nov. 15, 2013) ("[A] party moving for a preliminary injunction must necessarily establish a nexus between the character of the injury claimed in the party's motion for injunctive relief and the conduct asserted in the complaint."); *see also Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 516 F. Supp. 3d 943, 957 n.112 (D. Alaska 2021) (denying plaintiffs' motion for preliminary injunction because there was no clear nexus between the alleged procedural violation and the plaintiffs' alleged irreparable injury). Here, there is a mismatch between the nature of the alleged violation (which is focused on a failure to assess increased risk of fire) with the alleged injury (which is largely focused on aesthetic, recreational, and ecosystem services concerns from logging more broadly). Based on the way Plaintiffs have argued their NEPA claims, the proper focus of irreparable injury for Plaintiffs' NEPA claims is increased fire

Page 19 — OPINION AND ORDER

risk. Thus, unlike Plaintiffs' FLPMA claims, Plaintiffs' general allegations of aesthetic and recreational injuries lack a sufficient causal nexus to their NEPA claims.

Some Plaintiffs describe a fear of increased fire risk associated with the 42 Divide Project, while Defendant argues that whether a fire will actually occur is far too speculative to amount to irreparable harm. An increased risk of harm can amount to irreparable injury for purposes of a preliminary injunction. *See, e.g.*, *Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, 2019 WL 6465093, at *4 (D. Mont. Dec. 2, 2019). However, it is far from clear to this Court that implementation of the planned timber sales while this case is pending would substantially increase the risk of fire. It is also far from clear that any such increased risk is irreparable, as the record suggests that the risk of fire could be mitigated by post-harvest fuels treatment. The Court finds that Plaintiffs have failed to demonstrate a likelihood of irreparable injury with respect to their NEPA claims and therefore declines to order preliminary injunctive relief related to those claims.

## III.    Bond

Defendant and Defendant-Intervenors argue that Plaintiffs should be required to post a bond. Rule 65 generally requires a party moving for a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985). "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Landwatch v. Connaughton*, 905 F.

Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id.*

In support of their argument that Plaintiffs should be required to post a bond, Defendant-Intervenors include tax forms for the Plaintiff organizations showing a collective $5 million in net assets. Ghafouri Decl. Exs. A-C, ECF No. 24-1. On reply, the Plaintiff organizations provide declarations from their executive directors or board president explaining that, for various reasons, their year-end assets do not indicate that they have the ability to post a bond. ECF Nos. 28-30. Defendant-Intervenors moved to strike these declarations because they contend it is inappropriate to submit such evidence on reply. However, as Plaintiffs note, evidence is appropriately included in support of reply when it is in direct response to new evidence or arguments submitted with a response, as was the case here. *See Terrell v. Contra Costa Cnty.*, 232 F. App'x 626, 628-29 & n. 2 (9th Cir. 2007) (evidence submitted with a reply is not "new" when it "addressed the same set of facts supplied in . . . opposition to the motion but provides the full context to [the opposing party's] selected recitation of the facts"). Because this new evidence directly addresses and provides context to the selected facts included and discussed in Defendant-Intervenors' response, Defendant-Intervenors' motion to strike these declarations is denied.

Plaintiffs' supplemental declarations make clear that, due to the nature of their work and assets, requiring them to post a bond would work a significant hardship on the Plaintiff organizations, forcing them to choose between cases or other public-benefit activities. *See* Read Decl. ¶¶ 8-9, ECF No. 28; Laughlin Decl. ¶ 8, ECF No. 29; 2nd Reid Decl. ¶¶ 9-10, ECF No. 30. In light of this evidence and the chilling effect of imposing a bond requirement for preliminary

Page 21 — OPINION AND ORDER

injunctions in public interest environmental litigation under these circumstances, the Court exercises its discretion to waive the bond requirement here.

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Preliminary Injunction (ECF No. 21) is GRANTED in part and Defendant and Defendant-Intervenors Motions to Strike (ECF Nos. 31, 33) are DENIED. Defendant and Defendant-Intervenors are enjoined from implementing commercial logging of LSR and LSR-Dry stands in the 42 Divide Project pending the resolution of this litigation.

DATED this 17th day of July, 2026.

s/Mustafa T. Kasubhai
Mustafa T. Kasubhai (he/him)
United States District Judge